UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| EMERSON ELECTRIC CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| SUZHOU CLEVA ELECTRIC | ) | |
| APPLIANCE CO., LTD., | ) | Case No. 4:13-CV-01043 SPM |
| CLEVA HONG KONG LIMITED, | ) | |
| CLEVA NORTH AMERICA, INC., and | ) | |
| SEARS, ROEBUCK AND CO., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This matter is before the court on (1) the Motion to Strike Declarations of Hong Chen filed by Plaintiff Emerson Electric Co. ("Emerson") (Doc. 134); (2) the Renewed Motion to Dismiss filed by Suzhou Cleva Electric Appliance Co., Ltd. ("Suzhou Cleva") and Cleva Hong Kong Limited ("Cleva Hong Kong") (collectively, the "Cleva Defendants" or "Defendants") (Doc. 131); and (3) the Motion to Amend Case Management Order filed by Emerson. (Doc. 120). For the following reasons, I will grant Emerson's Motion to Strike, deny the Cleva Defendants' Motion to Dismiss, and grant Emerson's Motion to Amend Case Management Order.

## I.  BACKGROUND

### A.  Procedural Background and Background Regarding Motion to Strike

Emerson is the owner of several patents related to wet/dry vacuum cleaners. It has brought claims of patent infringement against Suzhou Cleva, Cleva Hong Kong, Cleva North

1

America, Inc., and Sears, Roebuck & Co., alleging that they manufacture, use, import, sell, and/or offer for sale in the United States one or more vacuum cleaners that infringe Emerson's patents. The allegedly infringing vacuum cleaners (the "Accused Products") include various vacuum cleaners sold under the Craftsman, Armor All, and Vacmaster trademarks.

On August 26, 2013, the Cleva Defendants filed a motion to dismiss under Rule 12(b)(2), arguing that this court cannot exercise personal jurisdiction over them because they are both Chinese companies that have not made, shipped, or sold the Accused Products in the United States and because they have no contacts with Missouri. (Doc. 19). They relied primarily on declarations of Hong Chen, the president and CEO of both companies. The court denied the motion to dismiss without prejudice and ordered the parties to conduct jurisdictional discovery. (Doc. 45).

On December 16, 2013, Emerson's counsel asked Defendants' counsel to propose some dates in early January for a deposition of Mr. Chen, and the parties agreed on a date of January 9, 2014. Emerson repeatedly asked for a location for the deposition that would work, but counsel for Defendants did not provide one. On January 2, 2014, Emerson's counsel stated that given the short time frame, it would pick a location for the deposition in Hong Kong unless Emerson heard from Defendants' counsel. On the same day, Defendants' counsel responded that it would let Emerson know about availability and that it was unreasonable for Emerson to "complain about a compressed timetable when Emerson waited until the week between Christmas and New Year's to request deposition dates and interpreter details."

On January 17, 2014, Emerson filed a motion to compel jurisdictional discovery, requesting, *inter alia*, that the court compel Mr. Chen to appear for a deposition in Missouri if he would not appear voluntarily in Hong Kong. Emerson indicated that Defendants had refused to

produce Mr. Chen for deposition anywhere other than in Suzhou, China, despite the fact that discovery in mainland China is prohibited under the Hague Evidence Convention and despite the fact that Emerson had offered to conduct the deposition in Hong Kong or to conduct the deposition by videoconference. (Doc. 58, at pp. 9-10). On January 22, after a hearing, the court entered an order deferring ruling on the question of Mr. Chen's deposition but cautioning Defendants that if they, in bad faith, failed to produce evidence requested in jurisdictional discovery, they risked the sanction of having such evidence excluded from consideration in a renewed motion to dismiss.

On January 23, 2014, Emerson's counsel emailed Defendants' counsel, stating, "Emerson requests that Suzhou Cleva and Cleva Hong Kong make Hong Chen available for deposition" and indicating that the deposition should occur either in Hong Kong or in the United States. On January 27, counsel for Defendants emailed Emerson's counsel and said that scheduling a deposition would be premature. In a telephone conference, Emerson's counsel informed Defendants' counsel that in light of the court's order, if Defendants did not produce Mr. Chen for deposition prior to renewing their motion to dismiss, Emerson would move to strike any evidence from Mr. Chen that Defendants might rely on in that motion. Defendants' counsel did not agree to schedule a deposition. On February 5, 2014, Emerson withdrew its motion to compel. (Doc. 82).

On April 1, 2014, the Cleva Defendants filed the instant renewed motion to dismiss the case against them for lack of personal jurisdiction, again relying on the declarations of Mr. Chen. In its response, Emerson submitted several exhibits obtained in jurisdictional discovery that it claims refute Mr. Chen's statements and support the exercise of personal jurisdiction over the Cleva Defendants. In addition, on April 11, 2014, Emerson filed the instant motion to strike the

declarations of Hong Chen on the ground that Defendants have not acted in good faith to make him available for deposition, in violation of the court's order of January 22, 2014.

### B.  Background Facts Relevant to Jurisdiction[1]

The Accused Products are manufactured at a factory in Suzhou, China called Skybest Electric Appliance Co. Ltd. ("Skybest").  Skybest shares an address with Suzhou Cleva.  In his deposition, Robert Davis, the president of Cleva North America, described Skybest as "the manufacturing arm" of Suzhou Cleva.  Mr. Davis did not know the precise legal relationship between Skybest and Suzhou Cleva but testified that Hong Chen, Suzhou Cleva's president, would know.  Documents produced by Sears reflect that, in the past, Mr. Davis described Suzhou Cleva and Cleva North America as having a "vertically integrated manufacturing facility" located in Suzhou, China, with no mention of Skybest.

The Accused Products are eventually sold or offered for sale at Sears retail stores in Missouri.  They generally follow one of two paths to reach retailers in the United States (including Sears): the "domestic sales" path and the "direct import" path.  Accused Products that reach U.S. retailers like Sears via the "domestic sales" path are sold by Cleva North America, a South Carolina-based company.  Cleva North America's president, Mr. Davis, testified that Cleva North America was formed for the purpose of selling, in North America, wet/dry vacuum cleaners manufactured in Suzhou.  Cleva North America purchases products at the Port of Shanghai in China,[2] ships them to a third-party warehouse in Alabama, and sells them to customers, including Sears and Wal-Mart.  Documentary evidence of the relationship of these

---

[1] These facts are taken from the pleadings as well as documents, affidavits, and deposition testimony obtained as part of jurisdictional discovery and submitted by the parties in support of their respective positions.

[2] It is not apparent from the record who Cleva North America purchases the products from or how these purchases occur.

transactions to Missouri includes a purchase order from Wal-Mart to Cleva North America for wet/dry vacuums with a billing address for Wal-Mart in St. Louis, Missouri.

Accused Products that reach U.S. retailers like Sears via the "direct import" sales path are marketed in the United States by Cleva North America and sold by Cleva Hong Kong.[3] According to deposition testimony, Cleva North America "fronts" marketing and advertising expenses related to these sales, and Cleva Hong Kong reimburses Cleva North America for those expenses. Cleva Hong Kong sells the products to customers such as Target, Sears, and Kmart,[4] with delivery "FOB CN[China]." At least one of the invoices in the record indicates that the "Destination" of the products was "USA." In addition, although the direct import sales are for delivery FOB China, Cleva Hong Kong pays sales commissions to Cleva North America employees for those sales. Mr. Davis also testified that a Cleva North America employee coordinates the direct import orders.

In addition to the direct import and domestic sales paths, there is evidence in the record that suggests Accused Products reach retailers like Sears via a Supply Agreement between the retailer and Suzhou Cleva. Emerson submitted a Supply Agreement in which Suzhou Cleva and Cleva North America, listed jointly as "Seller," agreed to sell various wet/dry vacuum cleaners bearing the Craftsman and Vacmaster trademarks to Sears and Kmart.[5]

---

[3] As with Cleva North America, it is unclear from the record how Cleva Hong Kong obtains the products to sell.

[4] The addresses listed for these companies are in the United States but not in Missouri.

[5] The Supply Agreement describes the seller (in part) as "Cleva Suzhou Electric Appliance Ltd" and lists its address as 8 Ting Rong Street, Suzhou, P.R., China, which is the address of Suzhou Cleva. Confusingly, the Supply Agreement also states that this company is organized under the laws of Hong Kong (whereas Suzhou Cleva is apparently organized under the laws of China) and subsequently refers to it "Cleva Hong Kong." However, the parties do not appear to dispute that this agreement was made by Suzhou Cleva rather than Cleva Hong Kong.

There is also other evidence of direct contact between Suzhou Cleva and Missouri. Suzhou Cleva is named as the "Insured" on several certificates of liability insurance that insure Missouri vendors with respect to product liability damages for "Vacuum Cleaners sold to USA/Canada." The Missouri vendors insured by these policies are O'Reilly Automotive, Inc., in Springfield, Missouri; Toronado Industries, LLC, in Fenton, Missouri; and Sutherland Lumber and/or Cimarron Lumber, in Kansas City, Missouri. Mr. Davis, the president of Cleva North America, testified that almost all major customers require a product liability insurance policy. He stated that he did not know who paid the premiums for the policies but that it was "basically done through the China office." Cleva Hong Kong and Cleva North America are listed as additional insureds on the certificates.

The evidence discussed above suggests that that Suzhou Cleva, Cleva Hong Kong, and Cleva North America are closely related and work together in the process by which the products reach Sears and other U.S. retailers. Other evidence is consistent with this. Hong Chen is the president and CEO of both Cleva Hong Kong and Suzhou Cleva, and he is one of two members of the board of directors of Cleva North America. According to testimony of Sears employees, he has attended meetings at the Sears office in Illinois and has attended trade shows in Las Vegas and a dinner hosted there by "Cleva." Mr. Chen has also worked with Mr. Davis on pricing proposals for Sears with respect to the Accused Products. Sears employees who met Mr. Chen testified that he "worked for Cleva," "was the owner of Cleva," or was "the representative from China" who came from Cleva; they did not distinguish between the different Cleva entities.

In addition, in presentations given to Sears employees, Cleva North America president Robert Davis stated that Cleva North America "[c]oordinates all operations with [the] Suzhou office daily." He described Suzhou Cleva as the "Head Office" and Cleva North America as the

"Sales Office." Mr. Davis also testified that there are no written agreements that govern the relationship between Cleva North America and Suzhou Cleva or between Cleva North America and Cleva Hong Kong. Indeed, Cleva North America uses the Vacmaster trademark (owned by Suzhou Cleva) without a formal license agreement and without paying royalties. Mr. Davis testified that the nature of the relationship between Cleva North America and Suzhou Cleva is such that he does not regard it as necessary to have a formal license in place.

The documentary evidence and deposition testimony produced during jurisdictional discovery are not entirely consistent with statements contained in the declarations of Hong Chen, the president of Suzhou Cleva and Cleva Hong Kong. In his declaration, Mr. Chen stated that Suzhou Cleva "has never sold or offered to sell anything in the U.S., directly, through retailers, or over the Internet." He also stated that Suzhou Cleva has never manufactured any vacuums anywhere, but he did not discuss the legal relationship between Suzhou Cleva and Skybest. He further stated that Suzhou Cleva has "no contacts with the State of Missouri" and never "contracted to insure any person, property, or risk located in Missouri at the time of contracting."

## II. DISCUSSION

### A. Motion to Strike

The court possesses the inherent power to impose sanctions in matters arising from discovery abuses. *See Sylla–Sawdon v. Uniroyal Goodrich Tire Co.,* 47 F.3d 277, 280 (8th Cir. 1995); *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 267 (8th Cir. 1993). *See also Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991) (district courts have the inherent power to "fashion an appropriate sanction for conduct which abuses the judicial process"). In its January 22, 2014 order, the court warned Defendants that if the court found that "Defendants, in bad faith, failed to produce evidence—testimonial or otherwise—that (i) was requested by Plaintiff during the

course of jurisdictional discovery and (ii) was within the scope of permissible discovery, sanctions may include the exclusion of such evidence as support for any subsequent motion to dismiss for lack of personal jurisdiction." (Doc. 64, at pp. 2-3). Citing that order, Emerson now moves to strike the declarations of Hong Chen on the ground that Defendants have, in bad faith, failed to produce Mr. Chen for deposition.

Defendants first argue that Mr. Chen's deposition was not "requested by Plaintiff during the course of jurisdictional discovery" because Emerson did not issue a formal notice of deposition for Mr. Chen. This argument is unpersuasive. As discussed above, Emerson repeatedly requested, by email, to depose Mr. Chen, and the parties discussed specific dates and locations by email. Most recently, on January 23, 2014, Emerson's counsel emailed Defendants and stated, "Emerson requests that Suzhou Cleva and Cleva Hong Kong make Hong Chen available for deposition" either in Hong Kong or the United States. Defendants consistently refused these requests and offered no alternative dates or locations for the deposition. They also opposed Emerson's motion to compel the deposition. There is nothing to suggest that any additional purpose would have been served by a formal notice of deposition.

Defendants further argue that Emerson's request to depose Mr. Chen was not "within the scope of permissible discovery" because Mr. Chen would have been required to travel over 600 miles from Suzhou, China, where he resides, to appear for a deposition in Hong Kong. However, Emerson has submitted authority showing that Mr. Chen cannot be legally deposed in China, and Defendants do not challenge that authority.[6] Moreover, Defendants offer no evidence

---

[6] United States State Department Guidelines state that under China's Declarations and Reservations to the Hague Evidence Convention, China does not permit attorneys to take voluntary depositions in China for use in foreign courts. *See* http://travel.state.gov/content/travel/english/legal-considerations/judicial/country/china.html, last visited June 19, 2014. In contrast, voluntary depositions may be taken in Hong Kong.

to suggest that Defendants were willing to produce Mr. Chen in *any* location where a deposition could legally have been conducted. In addition, the suggestion that it would be unduly burdensome for Mr. Chen to travel to Hong Kong is significantly undermined by the fact that he is the President and CEO of a company located in Hong Kong. Mr. Chen's unwillingness to travel to the city where his business is located does not constitute a good-faith basis for refusing to produce him for deposition, particularly in the absence of any attempt to explore other options.[7]

In sum, the court finds that Emerson properly requested the deposition of Mr. Chen during the course of jurisdictional discovery, the deposition was within the scope of jurisdictional discovery, and Defendants had no good-faith basis for failing to produce (or even attempt to produce) him for deposition. It would be unfair to permit Defendants to rely on Mr. Chen's statements in his declarations but then insulate those statements from any examination, particularly when Defendants have not offered any reasonable explanation for their conduct. Thus, in accordance with the court's prior order, Emerson's motion to strike the declarations of Hong Chen will be granted. However, as discussed below, even if the motion to strike were denied and statements of Mr. Chen were considered, the court's conclusion regarding the motion to dismiss would be the same.

---

http://travel.state.gov/content/travel/english/legal-considerations/judicial/country/hong-kong-sar-china.html.

[7] For example, the court notes that although he serves on the board of directors of Cleva North America and makes sales-related trips to the United States, Defendants did not offer to produce Mr. Chen in the United States.

## B. **Motion to Dismiss**

### 1. **Legal Standard**

The Cleva Defendants have filed a renewed motion to dismiss the claims against them for lack of personal jurisdiction under Rule 12(b)(2).  When a defendant challenges the existence of personal jurisdiction, the plaintiff ultimately has the burden of proving the existence of jurisdiction by a preponderance of the evidence.  *See Campbell Pet Co. v. Miale*, 542 F.3d 879, 889 (Fed. Cir. 2008); *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 646-47 (8th Cir. 2003).[8] However, when the court evaluates a Rule 12(b)(2) motion after some jurisdictional discovery but without an evidentiary hearing to resolve disputed issues of fact, the plaintiff generally needs only to make a prima facie showing that jurisdiction exists.  *See Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com. De Equip. Medico*, 563 F.3d 1285, 1290-92 (Fed. Cir. 2009) (applying prima facie standard to Rule 12(b)(2) motion after completion of some jurisdictional discovery but no evidentiary hearing); *Epps*, 327 F.3d at 646-47 (8th Cir. 2003) ("While the plaintiffs bear the ultimate burden of proof, jurisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing."); *AIT Indus. Automation, Inc. v. Applied Robotics, Inc.*, No. 1:09CV471, 2013 WL 1149174, at *2 (M.D. N.C. March 19, 2013) (prima facie standard applied where there had been jurisdictional discovery but no formal

---

[8] In patent cases such as this one, the law of the Federal Circuit Court of Appeals applies to questions pertaining to patent law, whereas the law of the regional circuit applies to purely procedural questions.  *See, e.g.*, *High Point Design LLC v. Buyers Direct, Inc.*, 730 F.3d 1301, 1311 (Fed. Cir. 2013).  Courts in this district have taken different approaches to the question of whether the standard applicable to a Rule 12(b)(2) motion is governed by Federal Circuit law or by the law of the regional circuit.  *Compare, e.g.*, *Am. Recreation Prods., LLC v. Tennier Indus., Inc.*, --- F. Supp.2d ----, No. 4:13CV421 CDP, 2014 WL 1315182, at *2 (E.D. Mo. March 14, 2014) (applying Federal Circuit law) *with Maritz Inc. v. C/Base, Inc.*, No. 406-CV-761 CAS, 2007 WL 433378, at *1 (E.D. Mo. Feb. 6, 2007) (applying Eighth Circuit law).  Because the standard relevant to the present case is the same under Federal Circuit and Eighth Circuit law, I need not decide this question.

evidentiary hearing); *Elan Microelectronics Corp. v. Pixcir Microelectronics Co. Ltd.*, No. 2:10–cv–00014–GMN–PAL, 2012 WL 523695, at *1 & n.1 (D. Nev. Feb. 16, 2012) (same).

Here, the jurisdictional facts are disputed and there has been no evidentiary hearing, so the prima facie standard applies. When applying the prima facie standard, the court must accept the uncontroverted allegations in the plaintiff's complaint as true and must resolve any factual conflicts in the evidence in the plaintiff's favor. *Elecs. For Imaging, Inc. v. Coyle,* 340 F.3d 1344, 1349 (Fed. Cir. 2003); *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591-92 (8th Cir. 2011).

### 2. Analysis

In order for this court to exercise jurisdiction over a nonresident defendant, two requirements must be met: (1) jurisdiction must be allowed by the Missouri long-arm statute; and (2) constitutional due process requirements must be satisfied. *Pennington Seed, Inc. v. Produce Exchange No. 299*, 457 F.3d 1334, 1343-44 (Fed. Cir. 2006). Although courts have often collapsed the statutory and constitutional questions into a single inquiry, the Eighth Circuit has recently analyzed Missouri Supreme Court decisions and concluded that "[t]he inquiries . . . are separate." *See Dairy Farmers of Am., Inc. v. Bassett & Walker Int'l, Inc.*, 702 F.3d 472, 475 (8th Cir. 2012) (citing *Bryant v. Smith Interior Design Group, Inc.*, 310 S.W.3d 227, 231-32 (Mo. 2010)). Thus, I will address the statutory and due process questions separately, beginning with the due process requirements.

### a. Due Process

Due process requires that before a court exercises personal jurisdiction over a defendant, the defendant must have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."

*Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). In order for there to be minimum contacts, "it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). "This purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts. . . ." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotation marks omitted). For jurisdiction to be proper, the defendant's conduct and connection with the forum state must be such that it "should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

The level of contacts required to satisfy the due process clause depends on whether the jurisdiction asserted is "general" or "specific." *See Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 & n.8, n.9 (1984). Emerson does not argue that general jurisdiction exists, so I will limit my discussion to specific jurisdiction. Under Federal Circuit law, specific jurisdiction is appropriate only if (1) the defendant purposefully directed its activities at residents of the forum, (2) the plaintiff's claims arise out of or relate to those activities, and (3) the assertion of personal jurisdiction under the circumstances is reasonable and fair. *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc*., 444 F.3d 1356, 1363 (Fed. Cir. 2006).

*(1) Purposefully Directed Activities*

Emerson argues that the Cleva Defendants service Missouri consumers through an established distribution network, which is sufficient to show purposeful direction under the

stream-of-commerce theory.[9]  Under the "stream-of-commerce" theory of personal jurisdiction, "[t]he forum does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum state."  *World-Wide Volkswagen Corp.*, 444 U.S. at 297-98.  However, the Supreme Court has not clearly established the requirements of this theory.  In *Asahi Metal Industry Co. v. Superior Court*, four justices adopted the view that it is not sufficient for a defendant to place its product into the stream of commerce with "awareness that the stream of commerce may or will sweep the product into the forum State"; rather, the defendant must engage in some "additional conduct" showing an intent or purpose to serve the market in the forum state.  480 U.S. 102, 112 (1987).  Another four justices, however, found that such "additional conduct" is not necessary, as long as the defendant is aware that the final product is being marketed in the forum state.  *Id.* at 117 (Brennan, White, Marshall, & Blackmun, JJ., concurring in part and concurring in the judgment).

The Federal Circuit has declined to decide which of the *Asahi* approaches to adopt.[10]  *See AFTG-TG, LLC v. Nuvoton Tech. Corp.*, 689 F.3d 1358, 1363-67 (Fed. Cir. 2012).  The Federal Circuit set forth its approach to the stream of commerce theory in *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1564 (Fed. Cir. 1994), a case similar to the instant case.  In

---

[9] Emerson also argues that Suzhou Cleva, Cleva Hong Kong, and Cleva North America are arms of the same business group, such that Cleva North America's contacts with Missouri should be imputed to the Cleva Defendants.  Because I find that Suzhou Cleva's and Cleva Hong Kong's own contacts with Missouri are sufficient to show activities purposefully directed at Missouri residents, I need not address this alternative argument.

[10] The law of the Federal Circuit, rather than the law of the Eighth Circuit, governs questions concerning the application of the stream of commerce theory of jurisdiction.  *See AFTG-TG*, 689 F.3d at 1367 n.1; *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1566 (Fed. Cir. 1994) (finding that creation of a uniform body of Federal Circuit law in the area of stream-of-commerce theory would promote judicial efficiency, be consistent with its mandates, and not create undue conflict and confusion in the district courts).

*Beverly Hills Fan*, a patentee filed suit in Virginia against a Chinese manufacturer and a New Jersey importer, alleging that they were selling the accused products to customers in the United States (including in Virginia), through intermediaries. *Id.* at 1560, 1563. The plaintiff submitted evidence that at least fifty-two of the accused products were sold at six Virginia outlets of the Builder's Square retail chain. *Id.* at 1561. The defendants moved to dismiss for lack of personal jurisdiction, providing evidence that they had no license for doing business in Virginia, had no assets or employees in Virginia, had no agents for service of process in the forum, and had not done any direct sales in Virginia. *Id.* at 1560. The court held that the facts before it were sufficient to establish the purposeful minimum contacts required for specific personal jurisdiction. *Id.* at 1566. The court noted that the presence of the products at several retail outlets in Virginia reflected an ongoing relationship and it inferred that the distribution channel formed by defendants and Builder's Square had been intentionally established. *Id.* at 1564. It stated,

> Defendants argue that their contacts with Virginia were insufficient to give them warning that litigation in Virginia might ensue. We disagree. The allegations are that defendants purposefully shipped the accused fan into Virginia through an established distribution channel. The cause of action for patent infringement is alleged to arise out of these activities. No more is usually required to establish specific jurisdiction.

*Id.* at 1565. The court acknowledged the Supreme Court's split in *Asahi* but did not resolve it, finding that the plaintiff had made the required showing under either version of the theory because "defendants, acting in consort, placed the accused fan in the stream of commerce, they knew the likely destination of the products, and their conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there." *Id.* at 1566.

Since *Beverly Hills Fan*, numerous district courts applying Federal Circuit law have found specific jurisdiction proper where a foreign manufacturer purposefully used intermediaries to reach a forum's consumers through the stream of commerce. *See Procter & Gamble Co. v. Team Techs.*, Inc., No. 1:12-CV-552, 2012 WL 5903126, at *4-*5 (S.D Ohio Nov. 26, 2012) (specific personal jurisdiction proper under *Beverly Hills Fan* where a foreign manufacturer made products with packaging stating that the products were to be sold at Rite Aid and CVS, the manufacturer sold the products to an intermediary, the intermediary sold them to Rite Aid and CVS stores, and the products were sold in CVS and Rite Aid stores in the forum state); *Momenta Pharm. Inc. v. Amphastar Pharm., Inc.*, 841 F. Supp. 2d 514, 520-21 (D. Mass. 2012) (specific personal jurisdiction present based on offers to sell accused products to intermediaries who serviced the Massachusetts market, because the defendants "exploited the typical industry medium by which manufacturers can reach the Massachusetts pharmaceutical market and thereby availed themselves of the privilege of doing business in Massachusetts"); *LG Elecs., Inc. v. Asutek Computers*, 126 F. Supp. 2d 414, 420 (E.D. Va. 2000) ("Regardless of whether Asutek delivered the products in Taiwan or directly to Virginia, Asutek places the products into the stream of commerce with the expectation that Asus will further assemble the products and distribute them throughout the United States. Such distribution's destination included retailers in Virginia. . . . Asustek purposefully directed its activities at Virginia because it continued to supply goods to Asus with the presumed knowledge that they would arrive in Virginia.").

As in the above cases, the facts developed by Emerson show that Suzhou Cleva and Cleva Hong Kong purposefully directed their activities at Missouri residents because they placed the Accused Products into established distribution channels with expectation that they would be sold throughout the United States, including in Missouri. Viewing the evidence in the light most

favorable to Emerson, Suzhou Cleva manufactures the Accused Products. Cleva North America's presentations to Sears indicated that Cleva North America and Suzhou Cleva had a "vertically integrated manufacturing facility" in Suzhou, China; the president of Cleva North America described the factory that manufactures the products as "the manufacturing arm" of Suzhou Cleva; and Suzhou Cleva shares an address with the factory that manufactures the Accused Products. I reject Defendants' suggestion that this evidence is insufficient to show that Suzhou Cleva manufactured the products because Cleva North America's president did not know the precise legal relationship between Suzhou Cleva and the factory. Defendants refused to produce for deposition the person that Mr. Davis testified *did* have such knowledge, Hong Chen. They also failed to produce any of their own evidence regarding the legal relationship between Suzhou Cleva and the factory.

I also find the evidence sufficient to show that Suzhou Cleva and Cleva Hong Kong purposefully used established distribution channels to reach customers in Missouri. In the domestic sales path, products manufactured by Suzhou Cleva are transferred to Cleva North America, a company formed for the express purpose of selling Suzhou Cleva's products in North America that markets and sells Suzhou Cleva's products to nationwide U.S. retailers with outlets in Missouri, including Sears and Wal-Mart. In the direct import sales path, Cleva Hong Kong pays Cleva North America to market Suzhou Cleva's products in the United States, then sells Suzhou Cleva's products to nationwide U.S. retailers with outlets in Missouri, including Sears and Wal-Mart. Finally, in addition to these sales through Cleva North America and Cleva Hong Kong, the Supply Agreement shows that Suzhou Cleva directly sold or offered for sale wet/dry

vacuum cleaners to Sears and Kmart.[11]  The Accused Products were eventually offered for sale in a Sears outlet in Missouri, and it is reasonable to assume that the products arrived there through these established distribution channels.  It is also significant that Suzhou Cleva and its president are actively involved in establishing and maintaining these distribution channels: Cleva North America "coordinates all operations with Suzhou office daily," and Hong Chen is on the board of directors of Cleva North America, attends presentations with Sears employees in the United States, and works with the president of Cleva North America on developing pricing proposals for Sears.

Suzhou Cleva's and Cleva Hong Kong's decisions to sell their products to nationwide retailers with outlets in Missouri provide strong evidence of their intent and purpose to reach Missouri customers.  *See Estes v. Midwest Prods., Inc.*, 24 F. Supp. 2d 621, 630 (S.D. W.Va. 1998) ("[The defendant] manufactures *finished* products which it directs to the 'national market' directly through its sales to national retailers Kmart, Wal-Mart, and others.  The defendant's intent and purpose are completely revealed in its decision to sell through national retail chains."); *Kernius v. Int'l Elecs., Inc.*, 433 F. Supp. 2d 621, 627 (D. Md. 2006) ("A corporation cannot sell its products to national retailers such as RadioShack, Best Buy, Target, and Wal-Mart and then claim that it is surprised to be haled into court in a particular State . . . ."); *Aten Int'l Co. v. Emine*

---

[11] Defendants suggest that the Supply Agreement does not show either a sale or offer to sell because the buyer's obligation to purchase does not arise until it issues a purchase order.  I find this argument unpersuasive.  Even if the buyer did not have an obligation to *buy* the products covered by the agreement, the contract clearly states that the seller (Suzhou Cleva and Cleva North America) "agrees to sell to Buyer the products listed in the attached Exhibit A."  This appears to the court to be at least sufficient to establish an "offer for sale" for purposes of patent infringement.  *See Superior Indus., LLC v. Thor Global Enters. Ltd.*, 700 F.3d 1287, 1294 (Fed. Cir. 2012) ("An 'offer for sale' sufficient to give rise to liability for patent infringement must meet the traditional contract law definition of that term.  Thus, the defendant must communicate a manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.") (internal citations and quotation marks omitted).

*Tech. Co.*, 261 F.R.D. 112, 119 (E.D. Tex. 2009) (continuous sales to a U.S. nationwide retailer provided a strong indication of an intention to sell products nationwide, including in Texas).

In addition, Defendants' intent to reach Missouri residents is shown by the fact that Suzhou Cleva purchased product liability insurance policies covering Missouri vendors of vacuum cleaners. Specifically, the record contains three Certificates of Liability Insurance for "vacuum cleaners sold to U.S.A.," each showing coverage for a different Missouri company (O'Reilly Automotive, Inc., in Springfield, Missouri; Tornado Industries, LLC/Tacony Corporation, Fenton, Missouri; and Sutherland Lumber/Cimarron Lumber, Kansas City, Missouri). Finally, some additional evidence is provided by a purchase order issued by Wal-Mart for the Accused Products that provides for direct billing to "Wal-Mart Stores, Inc./Sam's Club" in St. Louis, Missouri.

Cleva Hong Kong's argument that it did not sell any products in the United States because it sold the products FOB Shanghai, China is unpersuasive. FOB, or "free on board," is "a method of shipment whereby goods are delivered at a designated location, usually a transportation depot, at which legal title and thus the risk of loss passes from seller to buyer." *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1374 n.3 (Fed. Cir. 2005). The Federal Circuit has repeatedly rejected the notion that an FOB term in a contract establishes the place where a sale occurred for purposes of a patent infringement case. *See S.E.B. S.A. v. Montgomery Ward & Co.,* 594 F.3d 1360, 1375 (Fed. Cir. 2010) (rejecting the defendant's argument that because its sales of products to American retailers were made FOB Hong Kong or mainland China, those sales occurred overseas); *N. Am. Philips Corp. v. Am. Vending Sales, Inc.*, 35 F.3d 1576, 1579-80 (Fed. Cir. 1994) (rejecting argument that goods delivered FOB outside of Illinois were not sales in Illinois). *See also ATEN Int'l.*, 261 F.R.D. at

119-20 (finding a foreign manufacturer's FOB shipping term "irrelevant" to the analysis of whether it had purposefully directed its products to Texas through the stream of commerce in a patent infringement case).

In sum, the facts here are sufficient to satisfy the standard for purposefully directed activity articulated in *Beverly Hills Fan* and the other stream of commerce cases cited above. As in *Beverly Hills Fan*, "defendants, acting in consort, placed the accused [products] in the stream of commerce, they knew the likely destination of the products, and their conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there." 21 F.3d at 1566. Like the court in *Beverly Hills Fan*, this court need not resolve the *Asahi* split. This is not a case in which defendants were simply "aware[] that the stream of commerce may or will sweep the product into the forum State," *Asahi*, 480 U.S. at 112. Instead, the Cleva Defendants and their President and CEO (Hong Chen) deliberately established and used a distribution network designed to reach customers throughout the United States, including Missouri, and they did reach customers in Missouri. They engaged in sufficient "additional conduct" to satisfy the more demanding of the two *Asahi* tests.

The court's analysis would not change if Hong Chen's declarations were considered. As Defendants point out, Mr. Chen stated in his declaration that Cleva Hong Kong has never "sold, or offered to sell, in the U.S., any of the [Accused Products], directly, through retailers, or over the Internet." (Doc. 21-1, at ¶ 20). However, Mr. Chen's statement is refuted by the documentary and testimonial evidence showing that Cleva Hong Kong sells the Accused Products to Kmart, Sears, and Target. It appears from Mr. Chen's declaration that he believes that because the products were sold FOB China, Cleva Hong Kong did not sell them in the United States; however, as discussed above, that position is legally unsupportable. Mr. Chen

also stated that Suzhou Cleva has "never sold or offered to sell anything in the U.S., directly, through retailers, or over the Internet," has never manufactured any vacuums, and has no contacts with Missouri. (*Id.* ¶¶ 6-7, Doc. 27-1, ¶ 1). However, the evidence refutes these statements: Suzhou Cleva was the "Seller" in an agreement to sell wet/dry vacuum cleaners to Sears and Kmart; evidence suggests that Suzhou Cleva had a vertically integrated manufacturing facility that made the products; and Suzhou Cleva purchased insurance policies to cover Missouri retailers for product liability suits related to the products. Mr. Chen's conclusory and unexamined statements do not negate this evidence, particularly given that the court must resolve conflicts in the evidence in favor of Emerson.

### (2) Arising Out of or Relating to Defendants' Activities

The exercise of specific jurisdiction also requires that the action arise out of or relate to the defendant's activities with the forum state. *Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1350 (Fed. Cir. 2003). This is a patent infringement action based on the defendants' alleged manufacture, use, import, sale, and/or offer for sale of the allegedly infringing wet/dry vacuum cleaners. Defendant's contacts with Missouri relate to their indirect sales of these products into Missouri. Thus, this action arises from and relates to Defendants' activities with Missouri.

### (3) Reasonableness and Fairness

"Even if the requisite minimum contacts have been found through an application of the stream of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that jurisdiction be denied." *Beverly Hills Fan*, 21 F.3d at 1568. However, "defeats of otherwise constitutional personal jurisdiction [under this prong of the analysis] are limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so

attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." *Akro Corp. v. Luker*, 45 F.3d 1541, 1549 (Fed. Cir. 1995) (quotation marks omitted). *See also Burger King*, 471 U.S. at 476-77 (factors the court may consider include the burden on the defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several states in furthering fundamental substantive social policies).

Defendants do not argue that this is one of those rare cases that should be decided on this prong, nor does the record support such a finding. Emerson's interest in litigating this action in Missouri is great, as its principal place of business is in Missouri. Missouri's interests in the dispute are significant, as it has an interest in addressing the injuries that occur in the state from the sales of infringing products in Missouri. Although there is a burden on the Cleva Defendants associated with litigating in Missouri because of their locations in China, "progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome." *World–Wide Volkswagen*, 444 U.S. at 294 (quotation marks omitted). Moreover, given the Cleva Defendants' decision to avail themselves of the benefits of selling their products to retailers with outlets throughout the United States, it is neither unfair nor unreasonable to expect them to appear in court in one of the states containing those retail outlets.

For all of the above reasons, the exercise of personal jurisdiction in this case is consistent with due process requirements.

### b.  Missouri's long-arm statute

Missouri's long-arm statute authorizes personal jurisdiction over defendants who, *inter alia*, engage in "[t]he commission of a tortious act within this state" or in "[t]he transaction of

any business within this state" Mo. Rev. Stat. § 506.500.1. The statute will be interpreted "to provide for jurisdiction, within the specific categories enumerated in the statute[], to the full extent permitted by the due process clause . . . ." *State ex rel. Metal Serv. Ctr. of Ga., Inc. v. Gaertner*, 677 S.W.2d 325, 327 (Mo. 1984). The Missouri Supreme Court has held that "extraterritorial [tortious] acts that produce consequences in the state" are covered by the tortious act provision of the long-arm statute. *Bryant v. Smith Interior Design Group, Inc.*, 310 S.W.3d 227, 232 (Mo. 2010). *See also Furminator, Inc. v. Wahba*, No. 4:10CV01941 AGF, 2011 WL 3847390, at *1-*2 (E.D. Mo. Aug. 29, 2011) (finding the tortious acts provision of Missouri's long-arm statute satisfied in a trademark infringement case where the injury was felt in Missouri, because "Missouri's long-arm statute covers extraterritorial tortious acts that yield consequences in Missouri.") (citing *Bryant*, 310 S.W.3d at 232)).

In patent infringement cases, the Federal Circuit has held that "the situs of the injury is the location, or locations, at which the infringing activity directly impacts on the interests of the patentee." *Beverly Hills Fan*, 21 F.3d at 1571. Thus, in a case involving a foreign manufacturer who sold infringing products to intermediaries who then sold the products in Virginia, the situs of the injury was Virginia. *Id.* at 1569-71 (finding long-arm statute provision covering "causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth" was satisfied by actions of foreign manufacturer).

The principle articulated in *Beverly Hills Fan*, taken together with the Missouri Supreme Court's holding that extraterritorial acts producing consequences in the state are covered by the tortious act provision, suggests that when a foreign manufacturer sells infringing products into Missouri through intermediaries, the manufacturer's extraterritorial acts cause injury in Missouri and thus are covered by the Missouri long-arm statute. Here, as discussed at length above, the

evidence shows that Suzhou Cleva and Cleva Hong Kong sell the Accused Products to Missouri customers through intermediaries, and the Accused Products are in fact offered for sale at Sears retail outlets in Missouri.  Thus, I find that the alleged tortious acts of the Defendants, even if extraterritorial, yielded an injury in Missouri and are covered by the long-arm statute.  I need not reach the question of whether any other provisions of the long-arm statute are satisfied.

In sum, Emerson has made the required prima facie showing that this court may exercise personal jurisdiction over Cleva Hong Kong and Suzhou Cleva, because both the requirements of Missouri's long-arm statute and the requirements of the due process clause are satisfied.

### C. <u>Motion to Amend Case Management Order</u>

Emerson has moved to amend the Fourth Amended Case Management Order to extend certain deadlines for discovery and to continue the trial date.  Defendants oppose the motion.  In light of the instant order, the court finds it appropriate to extend the deadline for Emerson to seek discovery from Suzhou Cleva and Hong Kong and to complete other discovery that may be impacted by the inclusion of these parties in the case.  The court will order the parties to submit a joint proposed amended case management order and participate in a scheduling conference, after which the court will issue an amended case management order.

### III.  CONCLUSION

For all of the reasons stated above,

**IT IS HEREBY ORDERED** that Emerson's motion to strike the declarations of Hong Chen (Doc. 134) is **GRANTED**.

**IT IS FURTHER ORDERED** that Suzhou Cleva Electric Appliance Co., Ltd. and Cleva Hong Kong Limited's renewed motion to dismiss for lack of personal jurisdiction (Doc. 131) is **DENIED**.

**IT IS FURTHER ORDERED** that Emerson's motion to amend the case management order (Doc. 120) is **GRANTED**.

**IT IS FURTHER ORDERED** that the parties shall meet and confer and then submit a joint proposed amended case management order within fourteen (14) days of the date of this Memorandum and Order.

**IT IS FURTHER ORDERED** that a scheduling conference is set for **July 21, 2014**, at **12:30 p.m**, in the chambers of the undersigned, 13-South.  At the scheduling conference, counsel will be expected to discuss the deadlines and trial date set forth in the joint proposed case management order.   After the scheduling conference, the court will issue an amended case management order.

Dated this 1st day of July, 2014.

/s/ Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE